### PERKINS et al. v. THOMAS, Collector of Internal Revenue.

#### No. 4843.

District Court, N. D. Texas, Dallas Division.

June 11, 1936.

Harry C. Weeks, of Wichita Falls, Tex., for plaintiffs.

J. L. Backstrom, Sp. Atty., Bureau of Internal Revenue, of Dallas, Tex., and Frank B. Potter, Asst. U.S. Atty., of Fort Worth, Tex., for defendant.

ATWELL, District Judge.

J. J. Perkins and wife sue to recover certain income taxes for the year 1933. The first recovery is sought on payments made on what is known as the Ozier ranch deal. There were approximately 5400 acres of land purchased by the plaintiff, for $10,000. He claims that it was bought because of its mineral value, and that the surface was practically valueless. By 1933 he had transferred all of his mineral interests, so that from that source he had realized approximately $45 per acre. In 1936 he sold the surface for $3.75 per acre. The testimony supports his contention that the venture was attractive because of potential mineral value. Gas and oil were being discovered and were being produced in close proximity. The surface of the land was so rough that it had little value for even ranch purposes. When a transaction in respect to which a loss is claimed is closed and completed by some identifiable event, then such loss is deductible. Generally this occurs when the property is sold or otherwise disposed of. Coalinga-Mohawk Oil Co. v. Commissioner (C.C.A.) 64 F.(2d) 262. But when a property is of mineral nature and purchased because of that attraction, the bookkeeping need not await the final disposition of the fee provided the testimony is sufficient to show the completion of the mineral transaction. In this case the prof-

its from the mineral part of the land, which motivated the deal, were clearly ascertainable in the year 1933, and the taxpayer was not bounden to wait until the year 1936, when he sold the surface right in order to have a recoupment for his capital investment.

The testimony further shows that a figure of three-quarters for the mineral and one-quarter for the surface is quite generous on the part of the plaintiff.

The second transaction centers around the purchase of oil and gas leases in Gregg county in 1929. $105,000 in cash were paid, a note for $50,000 was given, which has since been settled, and $395,000 more were to be paid out of the oil produced and saved. The contract of sale had these provisions:

"Now, therefore, in consideration of the sum of ten dollars ($10.00) cash in hand paid by Faith Oil Corporation, a Texas corporation, and of the further sum of Three Hundred Ninety-five Thousand Dollars ($395,000.00) to be paid out of the oil produced and saved from the hereinafter described lands, and to be one fourth of all the oil produced and saved from the premises hereinafter described until the full sum of three hundred ninety five thousand dollars ($395,000.00) is paid, we, the said Mamie S. Hammonds, joined by her husband, O. O. Hammonds, and Fred P. Branson, all of Oklahoma City, Oklahoma County, Oklahoma, the present owners of said leases hereinafter described and all rights thereunder and incident thereto, do hereby bargain, sell, transfer, assign and convey all our right, title and interest in and to said leases and rights thereunder, hereinafter described, except the five acres specially excepted therefrom, to Faith Oil Corporation, its successors and assigns, to wit:"

There follows a detailed description of the oil and gas leases and lands covered thereby which are not material to the question involved. The instrument further provided as follows:

"As hereinbefore stated, three hundred ninety five thousand dollars ($395,000.00) is to be paid to Mamie S. Hammonds and Fred P. Branson, each to receive one half thereof out of the oil produced and saved from said leased premises, which payments shall be made by the pipe line company or other purchaser of said oil, and shall be one fourth (1/4) of all the oil produced and saved from the above described land until the full sum of three hundred ninety five thousand dollars ($395,000.00) is fully paid, which oil payments shall be made direct to the said Mamie S. Hammonds and Fred P. Branson, or their heirs and assigns, one half to each, by the purchaser or purchasers of said oil, when and as the same is run. It is understood and agreed that the said three hundred ninety-five thousand dollars ($395,000.00) is payable out of oil only, if, as and when produced from said lands above described, and said oil payment does not constitute and shall not be a personal obligation of the assignee its successors or assigns, nor impose any implied obligation with respect to drilling or development except in contract of June 30, 1931, the intention being that said three hundred ninety five thousand dollars ($395,000.00) shall be paid only out of and to the extent of the proceeds of one fourth of the oil produced and saved from said premises if, as and when produced.

"It is further agreed and understood that the oil payment herein specified shall bear none of the expenses of the development of said leases or any other burden."

At the time of the making of the leases to the plaintiffs, there were no producing wells. Now, there are 22 on the Burnett, 8 on the Fuller and 8 on the Fenton. Approximately one-half of the $395,000 oil payment had been paid up to March 13, 1936, and the balance will probably be paid within two and a half years, if production continues.

There is another tract in Upshur county, which was to be paid for by $45,000 in oil, but because of the court's view with reference to the case, it need not concern us.

The plaintiffs were required to include as a part of their income, the amount which they derived from the operation of the oil properties, and which they paid to their assignors under the assignment above quoted. They sue for such amounts. They were allowed depletion.

A case almost directly in point against the plaintiffs' contention is Comar Oil Company v. Burnet, 64 F.(2d) 965 (C.C.A. Eighth Circuit). In that case Palmer v. Bender, 287 U.S. 551, 553, 53 S.Ct. 225, 77 L.Ed. 489, is cited.

Counsel for the plaintiffs claim that Palmer v. Bender does not support the view taken in that case, and also calls

attention to Commissioner v. Fleming, 82 F.(2d) 324, 325, 327 (C.C.A.Fifth Circuit).

Palmer v. Bender uses the phrase, "economic interest." Economic interest has always been considered, but we have not looked at it in exactly the form presented in the Fleming Case. We have thought of it as an equitable interest—a mortgagee's interest. Some kind of unmeasured but clearly defined equity which may be asserted if and when the buyer proves recreant. The phrase appears in a depletion case.

Commissioner v. Fleming is also a depletion case. Neither Palmer v. Bender nor Commissioner v. Fleming deals with the obligation of the purchaser, except inferentially. In Commissioner v. Fleming, this language is used:

"While the contract was phrased as though the lease and all the oil were sold, and as though the proceeds were to be paid back to the seller, the real essence of the transaction was that the lease was sold and all of the oil Except that whose proceeds were to come to the selling taxpayer. The conveyances executed when the cash was paid might very appropriately have reserved or excepted sufficient oil from one-half of that thereafter run to pay the agreed sum. It is true that no royalty to continue indefinitely was reserved, and that the reservation was limited not to so many barrels nor to such a length of time, but to so much oil as would sell for the agreed sum. But it was in effect an exception or reservation of oil. The thing sold for the cash consideration was the lease and all the oil except that so reserved. If the wells had been agreed to be operated before conveyance until the sellers should receive this oil payment, it is evident that the depletion allowance would apply to his income from the oil. The source of the income and the seller's economic interest in the production of the oil were exactly the same under the agreement that was made. He is equally entitled to the depletion allowance. The purchaser could in no justice claim it as a deduction from his income."

In Pugh v. Commissioner (C.C.A.) 49 F.(2d) 76, 78, Judge Sibley, again writing, held that the transfer in that case was a sale, as it showed itself to be:

"We construe this to be a conveyance, operative from its date, of a half interest in the royalty right for a total consideration of $250,000, $50,000 being paid in cash, and a special arrangement being made for the payment of the remainder. The arrangement did not involve Eastham in personal liability, but appropriated the proceeds of his royalty oil to the payment [of Pugh, the seller], until the $200,000 should be paid. It is specially referred to as the half belonging to said Eastham. As the oil was produced, that due to this half of the royalty right was Eastham's oil. The risk of market price was his. When the proceeds were paid over to Pugh they were paid, not because the oil was Pugh's, but because it was pledged to Pugh. The money went to discharge the price due on Eastham's purchase, and to pay for the right which he had bought."

It will be noted that neither Perkins, the purchaser, nor the purchasers in either the Pugh or the Fleming Cases, assume any personal liability. They are identical, so far as that part of the trade is concerned. Fleming and Pugh were royalty holders and were granted relief from income on the ground that what they thought sold, was really not sold. Perkins, in the present case, the purchaser, not the royalty owner, claims relief on the ground that even though he did buy it, the soul of the transaction shows that the seller did not sell that quarter of the oil out of which he, the seller, was to be paid, to Perkins.

I do not see what right this court has to construe a plain contract between citizens, which does not need any construing, and then say that it does not mean exactly what it says. The contract between Perkins and those who sold to him, provides that, "The present owners * * *, do hereby bargain, sell, transfer, assign and convey all of our rights, title and interest in and to said leases and rights thereunder. * * *" Again, "It is understood and agreed that said $395,000.00 is payable out of oil only, if, as and when produced from said lands above described, and said oil payment does not constitute and shall not be a personal obligation of the assignee, its successors or assigns, nor impose any implied obligations with respect to drilling, * * * the intention being that said $395,-000.00 shall be paid only out of and to the extent of the proceeds of one-fourth of the oil produced and saved from said premises, if and when produced."

Certainly the seller has an economic interest in the one-fourth. The taking out of the one-fourth depleted the reservoir from which was to come the oil that would

pay him. It also depleted the reservoir that Perkins had bought; therefore, each was allowed depletion. But when payments out of that reservoir were made on what Perkins had promised to pay for it, it was income, so far as he was concerned. If it is not his property, then he could never pay the debt with it. He would merely be handing over to the seller what was already the seller's. It seems to me that Perkins bought that oil. He paid a large part of the purchase price in cash. The remainder he was to pay out of the oil as it was produced. If there was not enough oil to pay the entire unpaid portion, then he owed nothing more. It was oil that was bought and sold. The amount of the oil so bought and sold was unknown. Quite true the seller has an economic interest in it, in the sense that he will be protected and will be able to follow that oil wherever he can find it. He may reduce it or its proceeds to possession. It is subject to his process. Because of his equity in it, his economic interest must be satisfied. In order to hold otherwise, we must disregard all of our basic learning. We find ourselves at a loss to find any harmony in the thought that a seller sells and yet he does not sell. When citizens contract for a purchase and sale and then find the court construing their contract of purchase and sale to mean something else, when upon its face it is perfectly clear, it is confusing.

If we view the title to the oil as vesting in the buyer, subject to the rights of the seller, we escape such confusion. A recent case by the Circuit Court of Appeals for this Circuit is helpful. Standley v. Graham Production Company, 83 F.(2d) 489, decided May 7, 1936. Judge Foster stated that the assignment did not create an estate in the land, but only a lien on the oil after it had been separated from the soil.

Perhaps a court should never be concerned with the economic result of a holding, but a court cannot close his eyes to the far-reaching effect of a decision which would make a purchaser unconcerned, so far as his income tax return is viewed, by the amount that he is able to pay the one from whom he buys. Literally hundreds of millions of dollars that have been paid for oil leases and oil lands in Texas, to the sellers thereof, would be swept aside as income, and, for which accounting has been made to the government, if we in-

timate that because a seller has an economic interest in what he conveys to his buyer, on credit, that, therefore, the buyer should be allowed to set aside the explicit words of purchase and say that he really only bought that portion of the property which was evidenced by such returns as he did not have to pay on the purchase price. Such a thought is revolutionary in the field of contracts and a serious attack upon the legal definition of income.

A judgment may be prepared for the plaintiffs, giving them a recovery on the Ozier ranch mineral transaction, and against the plaintiffs on their contention as to oil income.